UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

ERIKA A. WILSON,

        Plaintiff,

v.                             ACTION NO. 2:14cv555

CAROLYN W. COLVIN,
ACTING COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Erika A. Wilson ("Wilson") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") concluding that her previous period of disability under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383(f), ended as a result of medical improvement. Wilson, who proceeds pro se, argues that her combination of several impairments leaves her disabled notwithstanding the improvement in her kidney disease which originally led to her disability. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the Court deny Wilson's Motion for Summary Judgment and grant the Commissioner's Motion for Summary Judgment affirming the final decision of the

1

Commissioner.

## I.  PROCEDURAL BACKGROUND

On August 2, 2012, the Social Security Administration found that Wilson no longer qualified for disability benefits. (R. 48-52). A disability hearing officer ("DHO") upheld the determination upon reconsideration on January 16, 2013. (R. 61-66). Wilson requested a review by an Administrative Law Judge (ALJ), (R. 70), which was conducted on July 24, 2013, (R. 24-46), and decided September 23, 2013, (R. 19).

The ALJ concluded that Wilson's disability ended on August 1, 2012, after her treating specialist stated she no longer required regular hemodialysis as a result of improved renal function. (R. 7-19). The Appeals Council denied review of the ALJ's decision, (R. 1-5), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), Wilson filed this action seeking judicial review of the Commissioner's final decision. This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II.  FACTUAL BACKGROUND

Wilson was thirty-nine years old when her disability ceased August 1, 2012. (R. 17). She has a high school diploma, attended college for two years, and holds a certified nursing assistant ("CNA") certification. (R. 32). Before receiving

2

disability, Wilson had been an assembly line worker for Ford Motor Company and a self-employed CNA home daycare worker. (R. 32-33).

On October 9, 2008, Wilson was declared disabled due to end-stage renal disease. (R. 10, 12). She has regularly seen two treating doctors: Dr. Daniel Rakowski, a kidney specialist, and Dr. Ruby Tucker, her primary care physician. (R. 35, 256-67, 320-38, 424-514). Wilson began seeing her treating specialist, Dr. Rakowski, in 2009 for hemodialysis. (R. 34, 257, 423). After four months, hemodialysis became unnecessary because of her positive response to steroid and mycophenolate treatments. (R. 13, 257, 423). Since then, Dr. Rakowski has recorded that Wilson's kidney disease and systemic lupus erythematosus[1] have remained stable with monthly shots of erythropoietin[2] and daily doses of CellCept.[3] (R. 35-6, 253-68, 423).

---

[1] "An inflammatory connective tissue disease with variable features, frequently including fever, weakness and fatigability, joint pains . . . diffuse [] skin lesions on the face . . . [and] anemia." Stedman's Medical Dictionary 1,037 (Maureen Barlow Pugh, ed., 27th ed. 2000).

[2] A hormone produced by the kidney which helps make red blood cells. Erythropoietin Stimulating Agents, Cleveland Clinic, http://my.clevelandclinic.org/health/diseases_conditions/hic_Anem ia/hic_erythropoietin-stimulating_agents (last updated September 2014).

[3] A prescription drug used to treat lupus. Mycophenolate Mofetil (CellCept) and Mycophenolate Sodium (Myfortic), American College of Rheumatology,

On May 2, 2011, Dr. Rakowski recommended increasing Wilson's CellCept prescription from 500 milligrams ("mg.") to 750 mg. to continue managing her kidney disease and lupus. (R. 264). At her next appointment on September 13, 2011, he reported that both conditions were stable on the higher dosage of CellCept. (R. 260). Specifically, he recorded that Wilson "feels great" and "there have been no more lupus symptoms at all." (R. 261). At Wilson's appointment in January 2012, Dr. Rakowski found no problems with her kidney disease, lupus, or anemia. (R. 256-57). Her only complaint was an on-going cough that could prevent her from singing in church the following Sunday. (R. 257). Her remaining visits that year were also unexceptional. (R. 320-38). Wilson reported in July that she "felt great." (R. 328).

Dr. Rakowski's letter dated July 31, 2012, is the demarcation point of Wilson's medical improvement for purposes of the Commissioner's action. (R. 423). In the letter, Dr. Rakowski affirmed that Wilson no longer required dialysis, but stated that she may need it in the future. (R. 423). In October 2012, Dr. Rakowski noted that Wilson continued to have chronic fatigue as a result of her kidney disease and anemia. (R. 335, 423). He reduced her CellCept dosage back to 500 mg.

---

http://www.rheumatology.org/Practice/Clinical/Patients/Medications/Mycophenolate_Mofetil_%28CellCept%29_and_Mycophenolate_Sodium_%28Myfortic%29/ (last updated May 2012).

in an attempt to wean her off of it. (R. 338). In January 2013, Dr. Rakowski further reduced Wilson's CellCept dosage to 250 mg. (R. 414). The lupus symptoms worsened, however, and he increased the dosage back to 500 mg. at her next appointment on January 24. (R. 418).

Dr. Tucker also found no work-disabling limitations associated with Wilson's impairments. (R. 424-514). She regularly reported that Wilson suffered from hypertension, lupus, kidney disease, and obesity. (R. 424-514). Wilson's visits in 2011 to Dr. Tucker were routine for a person with her conditions. (R. 424-32). In October 2011, Wilson reported that she was asymptomatic for lupus with no aching and soreness of the muscles and joints and complained of a lesion on her foot. (R. 426). In December 2011, Wilson developed a cough that persisted through the next few months. (R. 430, 433). Although Dr. Tucker consistently reported that Wilson's kidney disease and lupus were stable and that she did not have edema, (R. 433-58), Wilson experienced several other health problems in 2012 not related to the impairments underlying her claim. (R. 433-58). On April 4, 2012, Dr. Tucker diagnosed Wilson with acute bronchitis, which appears to have developed into pneumonia at her next visit on April 16, and prescribed medicine to treat it. (R. 439, 441). In July 2012, Wilson had a toe infection and her eczema flared up, for both of which Dr. Tucker prescribed

medicine. (R. 448). Then, in August 2012 Dr. Jorge Zarate found that she had developed viral meningitis.[4] (R. 450). Dr. Tucker had referred Wilson to Dr. Zarate for a headache complaint. Dr. Zarate and two renal consultants, Dr. Abdul Chaudry and Dr. Wei Zhao, also reported no edema in Wilson's extremities. (R. 365-70, 371-86, 387-97, 398-401).

In 2013, Wilson's documented medical appointments were similarly routine and apparently unremarkable for her lupus or kidney disease. (R. 459-82). In January 2013, she complained of a cystic swelling at the base of her thumb and pain in the ball of her foot. (R. 460). Dr. Tucker referred Wilson to Sentara Hand Surgeons for the swelling in her hand and ordered an x-ray and MRI to determine if there was a problem with her foot. (R. 462, 483, 485-86). The x-ray and MRI revealed no masses, "foreign bodies," or explanation for the focal sensitivity in Wilson's heel. (R. 483, 485-86). There does not appear to be a follow up examination in the record.

A consultative examiner, Dr. Joan Paul, evaluated Wilson on July 21, 2012, for her continuing disability claim. (R. 293-98); see 20 C.F.R. § 404.1512(e) (authorizing consultative exams at the Social Security Administration's expense). Wilson

---

[4] "[A]n inflammation of the tissue that covers the brain and spinal cord." "There is no specific treatment for viral meningitis and most people recover on their own within seven to ten days." Viral Meningitis, Centers for Disease Control and Prevention, http://www.cdc.gov/meningitis/viral.html (last updated Nov. 26, 2014).

complained of joint pain, heart palpitations, anemia, fatigue, cyanosis in her hands, and edema in her legs. (R. 293-95). On examination, however, Dr. Paul found that Wilson had no acute distress; no difficulty getting on and off the exam table or out of a chair; no heart murmurs; no edema in her extremities; no cyanosis; full range of motion in her wrists, shoulders, hips, knees, and ankles; the ability to "walk on her heels, toes, heel-to-toe, and squat;" no difficulty lying back on the exam table; no shortness of breath after the physical exam; and strength in her extremities and grip. (R. 295-96). Dr. Paul's medical source statement asserted that Wilson could control her symptoms by continuing to take medicine and regularly seeing her doctor. (R. 297). It also stated that Wilson should avoid prolonged overly strenuous activity, limited to two hours per eight-hour workday and lifting no more than twenty pounds at one time. (R. 297). Finally, Dr. Paul advised that Wilson could perform light duties in a sedentary position with fifteen minute breaks every two hours. (R. 297).

A State agency physician, Dr. Carolina Bacani-Longa, evaluated Wilson's medical record. (R. 299-306, 307-14). Dr. Bacani-Longa reviewed Dr. Paul's findings: anemia but no signs of fatigue; no problem getting on and off the exam table; full range of motion in wrists, shoulders, hips, knees, and ankles; and strength in all of Wilson's extremities and grip. (R. 306,

314). Dr. Bacani-Longa found no reported postural, manipulative, visual, communicative, or environmental limitations. (R. 301-03, 309-11). Wilson's creatinine had normalized since discontinuing dialysis, and she was not experiencing a flare up in her lupus or rheumatoid arthritis. (R. 306, 314). Moreover, there was no medical evidence to substantiate her claim of rheumatoid arthritis. Id. Upon examining Wilson's medical record, Dr. Bacani-Longa concluded that Wilson experienced medical improvement and no exceptions applied. (R. 306, 314).

Wilson's testimony at the ALJ hearing included a description of her daily activities. (R. 37-40). First, she testified that she lives in an apartment with her twelve-year-old son, (R. 30, 31), regularly fixes breakfast, and helps prepare him for school. (R. 37-38). Then, to start her day Wilson exercises by stretching for ten to fifteen minutes in order to "get [her] body going." (R. 38). She washes dishes, does the laundry, shops for groceries, and makes dinner. (R. 39). A couple of times a week she searches for jobs, but has not found one. (R. 38). In addition, Wilson drives locally and watches about four hours of television each day. (R. 39). On Sundays, she attends church for up to an hour and forty minutes and sings in the choir. (R. 38, 257). Wilson also testified that Dr. Rakowski's work-related restrictions included not

lifting over twenty-five pounds and keeping her legs elevated to manage her edema. (R. 35).

A Vocational Expert ("VE") testified at the ALJ hearing about the number of jobs in the national economy that Wilson could perform. (R. 42-44); see 20 C.F.R. § 404.1566 (authorizing ALJ's use of a VE in determining whether significant work exists). First, the VE confirmed Wilson's past work as a CNA and an assembly line worker. (R. 42-43). He rated CNA work as medium exertion and semi-skilled and assembly line work as medium exertion and unskilled. (R. 42-43); see 20 C.F.R. §§ 404.1567 and 404.1568 (defining exertion and skill requirements). The VE then testified that a hypothetical individual with certain physical limitations and the same age, education, and work background as Wilson could not perform her past relevant work. (R. 43). He did, however, provide examples of light exertion or sedentary, unskilled work in significant numbers in the national economy that the same hypothetical individual could perform. (R. 43-44). The light exertion jobs included: cleaner, laundry hand folder, and cashier. (R. 43-44). The sedentary jobs included: surveillance system or alarm monitor, telemarketer, and mail sort clerk. (R. 44). Although the Dictionary of Occupational Titles ("DOT") lists telemarketer as a semi-skilled job, the VE testified that based on his experience it is commonly performed unskilled. (R. 44). He

9

also confirmed that his testimony was otherwise consistent with the DOT.  (R. 44); see SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000) (requiring VE to explain any conflicts between testimony and DOT).

### III. STANDARD OF REVIEW

The Court's review is limited to determining whether the Commissioner's final decision was supported by substantial evidence in the record and whether the correct legal standards were applied in evaluating the evidence.  42 U.S.C. § 405(g); 20 C.F.R. § 404.1520; see Hill v. Colvin, No. 1:14cv1261, 2015 WL 1208803, at *3 (E.D. Va. Mar. 16, 2015) (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456.  "Where conflicting evidence allows reasonable minds to differ as to

10

whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

"There is no presumption that a claimant's disability continues . . . ." Landes v. Barnhart, No. 5:05CV00033, 2005 WL 3542591, at *1 (W.D. Va. Dec. 21, 2005). But, when the Social Security Administration terminates benefits, it must demonstrate that the individual no longer meets the requirements for disability. Sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, require that an individual be under a "disability" as defined in the Act in order to continue receiving disability insurance benefits.

The Social Security Regulations define "disability" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether to terminate benefits. See 20 C.F.R. § 404.1520(a)(3). The Commissioner must follow an eight-step sequential analysis to determine when termination is proper. The eight questions which the ALJ must answer are:

1. Is the individual currently involved in substantial gainful activity? If so, the individual is no longer disabled. If not, the ALJ proceeds to step two.

2. Does the individual have an impairment or combination of impairments which meets or equals the severity of one listed at 20 C.F.R. § 404, Subpart P, App. 1? If so, the individual is still disabled. If not, the ALJ proceeds to step three.

3. Has there been a medical improvement, i.e., "any decrease in medical severity of the impairment as established by improvement in symptoms, signs and/or laboratory findings?" Edge v. Astrue, 627 F. Supp. 2d 609, 615 (E.D. N.C. 2008); see

12

20 C.F.R. § 404.1594(b)(1). If so, the ALJ proceeds to step four. If not, the ALJ proceeds to step five.

4. Is the medical improvement related to the individual's ability to do work?[5] If so, the ALJ proceeds to step six. If not, the ALJ proceeds to step five.

5. Does an exception to the medical improvement requirement apply? There are two groups of exceptions. If a group one exception applies, the ALJ proceeds to step six.[6] If a group two exception applies, the individual is no longer disabled.[7] If no exception applies, or no medical improvement occurs, the individual is still disabled.

6. Are all current impairments in combination "severe"?[8] If so, the ALJ proceeds to step seven. If not, the individual is no longer disabled.

---

[5] Medical improvement is related to an individual's ability to do work if (1) there has been a decrease in the severity of the impairment, and (2) it results in an increase in the claimant's capacity to perform basic work activities. 20 C.F.R. § 404.1594(b)(3).

[6] Group one exceptions determine if disability ends even though there has not been medical improvement using a substantial evidence standard. For example, if the claimant benefits from advances in work-related medical or vocational therapy or technology, then disability may end. 20 C.F.R. § 404.1594(d).

[7] Group two exceptions cover situations such as fraudulently obtained prior decisions. 20 C.F.R. § 404.1594(3). The decision is made without a determination of medical improvement or claimant's ability to engage in substantial gainful activity, and may be considered at any point during the analysis. Id.

[8] An impairment or combination of impairments is "severe" when it significantly limits the claimant's physical or mental ability to perform basic work activities. 20 C.F.R. § 404.1521(a).

7. What is the claimant's residual functional capacity ("RFC"), and current ability to perform past relevant work?  If the individual is able to perform past relevant work, then he or she is no longer disabled.  If the individual is not able to perform past relevant work, the ALJ proceeds to step eight.

8. Does the individual currently have the ability to perform other work in the national economy given his or her RFC, age, education, and past work experience?  If so, the individual is no longer disabled.  If not, the individual is still disabled, and remains eligible to receive benefits.  20 C.F.R. § 404.1594(f)(1)-(8); see Hill, 2015 WL 1208803, at *6; Edge, 627 F. Supp. 2d at 615.

The burden of proving disability generally rests with the claimant, except "a limited burden of going forward with evidence shifts to the Social Security Administration" at step eight.  Hill, 2015 WL 1208803, at *7; see Guiton v. Colvin, F. App'x 137, 141 (4th Cir. 2013) (unpublished).  When conducting this eight-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age.  Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir.

1962)).  At all steps the ALJ bears the ultimate responsibility for weighing the evidence.  <u>Hays</u>, 907 F.2d at 1456.

## A.   The ALJ's Decision

In this case, the ALJ concluded that Wilson was not disabled as of August 1, 2012.  Using the eight-part analysis prescribed by the Rules, 20 C.F.R. § 404.1594(f)(1)-(8), the ALJ first found that Wilson had not engaged in substantial gainful activity through the end of disability, and had the following medically determinable severe impairments: systemic lupus erythematosus, anemia, kidney disorder, and obesity; and non-severe impairments: hypertension and foot drop.  (R. 12-13).  No impairment or combination of impairments met or equaled the severity of one listed.  (R. 12-13).  Next, the ALJ found work-related medical improvement as of August 1, 2012, because Wilson no longer required hemodialysis to treat her renal disorder, and her impairments, though severe, no longer met or medically equaled the same listing that was met at the time of the comparison point decision ("CPD").[9]  (R. 12-13).  Finally, the ALJ concluded that despite her impairments, at the time of the hearing, Wilson had the RFC to perform a reduced range of light work.  (R. 13-17).  She was unable to perform past relevant

---

[9] CPD is the time of the most recent favorable medical decision finding the claimant disabled. On October 29, 2008, Wilson was found disabled based on the severity of her renal disease which satisfied the criteria of listing 6.02.  (R. 12).

work, but, jobs exist in significant numbers in the national economy that Wilson can perform given her RFC, age, educational background, and past work experience. (R. 13-17).

Wilson's pro se Motion for Summary Judgment, though inartfully drafted, appears to suggest that the ALJ failed to evaluate the limitations resulting from all of her impairments, and as a result, erred in his conclusion that she retained the ability to perform light work. Her arguments also present the issue of whether the ALJ erred by only partially crediting her own descriptions of her limitations and using "boilerplate" language to assess her credibility. Finally, Wilson has produced new medical source opinions from her treating providers, Dr. Tucker and Dr. Rakowski, which appear to suggest her kidney disease has worsened since the ALJ's decision. This report considers each argument in turn below.

B.    **The ALJ properly evaluated the evidence bearing on Wilson's RFC.**

Because Wilson is a pro se litigant, she is entitled to a liberal construction of her pleadings. See Miller v. Barnhart, 64 F. App'x 858, 859 (4th Cir. 2003) (unpublished) (per curiam) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)). Her pleading appears to raise the issue that the ALJ erred in determining her residual functional capacity ("RFC"), which is defined as the plaintiff's maximum ability to work despite her

impairments. 20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (July 2, 1996) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis . . . ."). Specifically, she claims the ALJ selectively credited the medical source statements and did not properly weigh her own testimony.

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC. 20 C.F.R. § 404.1546(c). When the claimant's impairments in combination are not severe under step six of the sequential analysis, the ALJ then must determine the claimant's current RFC. Id. at § 404.1594(f)(6)-(7). The ALJ next uses the current RFC at step seven to determine if the claimant can perform her past relevant work. Id. at § 404.1594(f)(7). If the claimant cannot perform past relevant work, the ALJ then determines at step eight whether there are a significant number of jobs in the national economy that the claimant can perform. Id. at § 404.1594(f)(8).

RFC is determined by considering all the relevant medical and other evidence[10] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' –

---

[10] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2. In this case, the ALJ found that Wilson has the RFC to perform a reduced range of light work with specified limitations, including lifting, carrying, pushing, and pulling up to twenty pounds occasionally and ten pounds frequently; standing or walking at least six hours in an eight hour day; sitting at least six hours within an eight hour day; and performing postural movements frequently. (R. 13); see 20 C.F.R. § 404.1567(b) (defining light work). In doing so, the ALJ properly analyzed the evidence before him, including the medical evidence from Dr. Rakowski and Dr. Tucker, and the medical opinions of Dr. Paul and the State agency physician; and he properly explained his assessment of Wilson's credibility.

a. **The ALJ properly explained the weight assigned to all medical source statements.**

Wilson first contends that the ALJ erred by improperly considering and evaluating the evidence, including the medical source statements submitted by the non-examining State agency physician, Dr. Bacani-Longa, and the consultative examiner, Dr. Paul. (R. 14-15, 16). Specifically, she argues that the ALJ impermissibly gave weight to some portions of Dr. Paul's opinion while disregarding others.

As stated previously, the ALJ alone has the responsibility of determining RFC. 20 C.F.R. § 404.1546(c). In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. Id. at § 404.1545(a). Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairment(s), including her symptoms, diagnosis and prognosis, what she can still do despite impairment(s), and her physical or mental restrictions. Id. at § 1527(a)(2). In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. Id. at § 404.1527.

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at §

404.1527(d)(2).   Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5. When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. 20 C.F.R. § 404.1527(d)(2).[11]

In this case, the ALJ did not give controlling weight to any opinion, because neither of Wilson's treating doctors, Dr. Rakowski and Dr. Tucker, offered a medical opinion regarding the limitations imposed by her impairments. He did, however, review their findings in detail. (R. 15-16). The ALJ can look to objective medical evidence in the record when evaluating medical source statements, such as the signs and symptoms described by Wilson's treating physicians. See 20 C.F.R. §§ 404.1528 and

---

[11] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, nontreating sources, State agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(ii).

404.1527(b).   The ALJ properly relied on Wilson's treatment history with Dr. Rakowski and Dr. Tucker, because treating physicians are the "medical professionals most able to provide a detailed, longitudinal picture of [her] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations . . . ."   Id. at § 404.1527(c)(2) (describing the factors for weighing medical evidence).

Wilson began seeing Dr. Rakowski in 2009 for hemodialysis, and Dr. Tucker has been her primary physician since at least September 2011.   (R. 423, 424).   After four months of treatment, hemodialysis became unnecessary.   (R. 13, 265).   The ALJ asserted that although Wilson continued to see Dr. Rakowski after stopping hemodialysis, he consistently reported that her kidney disease was "stable" and that "there have been no more lupus symptoms at all."   (R. 15, 256-67, 320-38, 414-22).   Dr. Rakowski's July 31, 2012, letter added that Wilson may require dialysis in the future, but her kidney disease is stable at stage three.[12]   (R. 423).   At the August 2012 hearing, the ALJ acknowledged the possible requirement of dialysis in the future, but asserted that "conjectures of future possibility are of

---

[12] The letter itself states that Wilson has stage four kidney disease, but, as the ALJ recognizes, Dr. Rakowski refers to it as stage three kidney disease in all other records.   (R. 13).

little value in the adjudication of current disability." (R. 13). Dr. Rakowski attempted to reduce Wilson's lupus prescription, CellCept, from 500 mg. to 250 mg. in January 2013 but increased it back to the original amount at the January 24 appointment after her lupus symptoms worsened. (R. 414, 418).

The ALJ also found that Dr. Tucker "identified only normal findings," except for obesity, and regularly reported that Wilson did not have edema in her lower extremities. (R. 15, 424-82). Dr. Tucker consistently reported that Wilson's kidney disease and lupus were stable. (R. 424-514). Although Wilson did experience medical problems in 2012, including viral meningitis, none were related to the impairments underlying her claim. (R. 433-58). She also complained of pain in the ball of her heel in January 2013, but the x-ray and MRI were inconclusive. (R. 462, 483, 485-86). There is no evidence in the record of a follow-up examination for this complaint.

With regard to the non-examining State agency physicians, they decidedly found Wilson less limited than the ALJ. (R. 299-306, 307-14). Wilson argues that the ALJ credited their findings without considering the contrary medical evidence from the consultative examiner, Dr. Paul, and her subjective complaints. State agency reviewers are non-examining sources. 20 C.F.R. § 404.1527(e). Where a treating source is not given controlling weight, non-examining source opinion evidence must

be assessed by reference to the factors set forth at 20 C.F.R. §§ 404.1527(c)(1)-(6). See id. at § 404.1527(e)(2)(ii). But ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists." Id. at § 404.1527(e)(2)(i). Though they must consider State agency medical consultant findings and opinions as opinion evidence, the "ultimate determination about whether" an individual is disabled is clearly reserved for the ALJ. Id.

In this case, the ALJ properly weighed the State agency physician's opinion. (R. 14-15). Dr. Bacani-Longa opined that Wilson could perform the full range of medium work. (R. 14, 299-306, 307-14). She reviewed the findings of the consultative examiner, Dr. Paul, and Wilson's other medical records showing that Wilson had anemia but no signs of fatigue; no problem getting on and off the exam table; full range of motion in her wrists, shoulders, hips, knees, and ankles; and strength in all of her extremities and grip. (R. 306, 314). Further, Wilson's medical record established no postural, manipulative, visual, communicative, or environmental limitations. (R. 301-03, 309-11). The ALJ, however, decided that Dr. Bacani-Longa did not take into account the combined effects of Wilson's impairments and the evidence acquired for the hearing in determining her RFC. (R. 14-15). In particular, he focused on the effect of Wilson's fatigue, which he concluded reasonably limited her to

light work with some slight postural restrictions. Id.  Thus, the ALJ gave Dr. Bacani-Longa's opinion little weight. Id.  His resulting RFC found her substantially more limited, though still not disabled.

The ALJ gave moderate weight to the opinion of the consultative examiner, Dr. Paul. (R. 16). When a medical source provides evidence that supports its decision and is consistent with the medical record as a whole, the ALJ will give it more weight. See 20 C.F.R. § 404.1527(c). Dr. Paul found that Wilson had no acute distress, no difficulty getting on and off of the exam table or in and out of a chair, no edema in her lower extremities, full range of motion, and strength in her extremities and grip. (R. 295-96). Dr. Paul's medical source statement asserted that Wilson would not have any difficulty performing light duties in a sedentary position with appropriate fifteen minute breaks for every two hours of work. (R. 297). The ALJ concurred with Dr. Paul's statement that Wilson could perform sedentary work. (R. 16). He did not agree, however, with the remainder of the opinion including the requirement of fifteen minute breaks for every two hours of work, because it was "based upon subjective complaints and not objective medical findings." (R. 16); see Harris v. Comm'r of Soc. Sec., No. 2:04cv5132005, U.S. Dist. LEXIS 9290, at *26 (E.D. Va. 2005) (unpublished) (quoting Loza v. Apfel, 219 F.3d 378, 393 (5th

Cir. 2000) (explaining that although the ALJ cannot "pick and choose" only the evidence that supports his position, a claimant's subjective complaints of pain alone are not enough to establish that there is an impairment).   Because the ALJ explained the reasons why he afforded the remainder of the opinion little weight, and the medical record confirms Dr. Paul's reliance on subjective complaints, the ALJ properly weighed Dr. Paul's medical opinion.

Contrary to Wilson's suggestion, the ALJ properly considered all of the evidence when making his RFC determination.   The ALJ granted little weight to the less restrictive opinion of Dr. Bacani-Longa, because it failed to consider the limiting effect of Wilson's impairments in combination.   The ALJ properly gave moderate weight to the consultative examiner's opinion, because it was consistent with the medical record as a whole and supported by objective evidence. He also carefully reviewed the records of the treating physicians regarding Wilson's medical improvement and present limitations.   For this reason, the ALJ's finding that Wilson could engage in a limited range of light and sedentary work was supported by substantial evidence.

b.   **The ALJ correctly assessed Wilson's credibility and evaluated her complaints of pain.**

Wilson next argues that the ALJ erred in finding her

statements concerning the intensity, persistence and limiting effect of her symptoms inconsistent with the medical record. (R. 16). The ALJ specifically found Wilson's description of her alleged symptoms and limitations only partially credible. (R. 16).

In deciding whether a claimant is disabled, the ALJ must consider all symptoms, including pain, and the extent to which such symptoms can reasonably be accepted as consistent with the objective evidence. 20 C.F.R. § 404.1529(a). A claimant's subjective statements about pain or other symptoms alone are not enough to establish disability. Id. Under both federal regulations and Fourth Circuit precedent, determining whether a person is disabled by pain or other symptoms is a two-step process. Id.; 1996 WL 374186; see Craig, 76 F.3d at 594. First, the claimant must satisfy a threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594-95. "However, while a claimant must show by objective evidence the existence of an underlying impairment that could cause the pain alleged, 'there need not be objective evidence of the pain itself.'" Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986)).

After the claimant has satisfied the first step, the ALJ

must then evaluate the intensity, persistence, and limiting effects of the claimant's symptoms and the extent to which they affect her ability to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the claimant's history, including her own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," id. at § 404.1529(c)(2); and (3) other evidence submitted by the claimant relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms, id. at § 404.1529(c)(3).

In evaluating the intensity and persistence of the claimant's symptoms and the extent to which they affect her ability to work, the ALJ must consider whether inconsistencies exist and the extent to which there is conflict between the claimant's statements and the other evidence. Id. at § 404.1529(c)(4). According to the regulations, a claimant's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the

objective medical evidence and other evidence." Id.

In describing his conclusion that Wilson's description of her symptoms was not fully credible, the ALJ relied on familiar language, concluding that Wilson's statements regarding the "intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment . . . ." (R. 16). Such "boilerplate" language is insufficient to establish that the ALJ correctly assessed her credibility. See Mascio v. Colvin, 780 F.3d 632, 639 (4th Cir. 2015) (citing Bjornson v. Astrue, 671 F.3d 640, 645-46 (7th Cir. 2012)); Little v. Colvin, No. 2:12cv300, 2013 WL 2489173 (E.D. Va. June 7, 2013). Courts, including this one, have criticized the use of this boilerplate language which the Agency refers to as a "template." Those opinions point out that the template suggests that RFC has been determined before a claimant's credibility has been assessed. See Mascio, 780 F.3d at 39 (describing the use of template language as error). When the ALJ properly analyzes the claimant's credibility elsewhere, however, then the error is harmless. Sharp v. Colvin, No. 3:14cv340, 2015 WL 1517416, at *4 n. 3 (E.D. Va. 2015) (unpublished) (citing Mascio, 780 F.3d at 639) (describing under what circumstances the ALJ's error is harmless). Notably in this case, the ALJ's "boilerplate" language ends with the phrase "for the reasons explained below."

(R. 16).

While the ALJ's template language suggests error in the credibility analysis required by the Commissioner's own regulations, in this case, Wilson's testimony was limited and the ALJ's written opinion included a detailed review of the evidence he relied upon to only partially credit Wilson's complaints. Although he framed his conclusion on credibility with an unhelpful "template," the Court finds the ALJ properly evaluated Wilson's credibility. Accordingly, his decision to frame his conclusion on credibility with erroneous boilerplate does not prevent the Court from assessing his credibility finding.

Wilson's testimony concerning "the intensity, persistence and limiting effects" of her symptoms is contradictory. Although she complained of "serious, severe edema" in her legs, joint pain, and restrictions on her ability to lift, Wilson also stated that she manages to care for herself and her twelve-year-old son, and perform daily chores and activities, which the ALJ called "far more than minimal." (R. 17, 31-32, 35, 37-39). She reported cooking breakfast in the morning for her son and herself and helping him prepare for school. (R. 37-38). Wilson also exercises by stretching for about ten or fifteen minutes to "get [her] body going." (R. 38). She attends church every Sunday for up to an hour and forty-five minutes singing in the

choir and drives locally. (R. 38, 39, 257). The ALJ found that Wilson's daily activities are "not consistent with the degree of functioning one would expect of an individual who is disabled." (R. 17). She testified that her treating specialist, Dr. Rakowski, ordered her to keep her legs elevated due to her edema. (R. 35). And during the ALJ's examination, Wilson stated that she keeps her legs elevated "[m]aybe not 50 percent of the day but closer to that." (R. 37). The ALJ recognized that Wilson's daily activities contradicted her testimony at the hearing. Although her daily activities alone do not support finding her not disabled, in combination with the objective medical evidence it is sufficient to only partially credit her complaint of disabling swelling. 20 C.F.R. § 404.1529(a) ("[W]e consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."); SSR 96-7p.

Wilson testified that Dr. Rakowski restricted her to lifting no more than twenty-five pounds, and ordered her to maintain or lose weight, continue taking her medication, and keep her legs elevated. (R. 35). The ALJ, however, found that part of her statements contradicted this medical record. (R. 16-17). The ALJ properly explained this finding noting that there was no evidence that Dr. Rakowski restricted Wilson's

ability to lift or ordered her to keep her legs elevated.  (R. 256-67, 320-38, 414-22).  Moreover, Wilson did not complain of edema in her legs during her medical appointments.  (R. 456-67, 320-38, 414-22).  Dr. Tucker also did not report signs of edema. (R. 424-82).  The ALJ asserted that Dr. Tucker made "only normal findings."  (R. 15).  The ALJ also acknowledged that while Wilson may have transient edema, there is no support for the level of swelling she reported.  (R. 17).  Although Wilson did suffer from other medical conditions, especially in 2012, none were related to the impairments underlying her claim.  (R. 433-58).  As with Dr. Rakowski, Wilson did not tell Dr. Tucker about edema nor any other symptoms related to the impairments underlying her claim.  (R. 424-82).  The ALJ further supported his position by acknowledging that Wilson's ability to wear high heels is incompatible with the allegation of severe edema or a finding that she cannot perform light work.  (R. 17).  The consultative examiner, Dr. Paul, made findings similar to Dr. Rakowski and Dr. Tucker.  (R. 293-98).  She found that Wilson had no problem getting on and off the exam table, up and out of a chair, lying back on a table without difficulty, walking on heels, walking on toes, heel-to-toe walking, and squatting.  (R. 296).  Further, during her physical exam Dr. Paul found no edema in Wilson's lower extremities or signs of fatigue.  Id.  She stated that Wilson's physical exam was "benign" and acknowledged

31

that her findings concerning Wilson's work-related limitations related to fatigue were based on subjective complaints rather than objective findings. (R. 297). The ALJ explained that he was only adopting part of Dr. Paul's opinion, because a portion of it was based on these subjective complaints. (R. 16).

Considering this testimony, the ALJ's RFC aligns closely with the limitations Wilson described. He imposed limitations on sitting and standing at least six hours within an eight-hour workday; lifting, carrying, pushing, and pulling up to twenty pounds occasionally and ten pounds frequently; and performing postural movements frequently. (R. 43). To the extent Wilson's testimony could be interpreted to require a more restrictive RFC, the ALJ explained his reasons for not so finding. (R. 13-17). He observed the discrepancies in Wilson's complaints and the objective medical evidence and noted that she had no lower extremity edema. (R. 13-17). He also observed that in multiple visits to Dr. Rakowski and Dr. Tucker her physical exams were "unremarkable" for someone with her impairments. (R. 15). He also wrote that she had received no hemodialysis after it became unnecessary, and took into account her objective medical history to determine her work limitations. (R. 13-17). Thus, the ALJ met his burden under the rules to explain the basis of his credibility assessment. See Bill Branch Coal Corp. v. Sparks, 213 F.3d 186, 190 (4th Cir. 2000) (requiring an ALJ to "'analyze

all of the relevant evidence' and to provide a sufficient explanation for their 'rationale in crediting certain evidence'").

## C. Wilson's Post-Hearing Evidence Does Not Warrant Remand

Wilson submitted a letter written after the ALJ's decision from her treating physician, Dr. Tucker, to the Appeals Council as new evidence. (R. 6). The Appeals Council considered the letter but denied Wilson's request for review, stating that her additional evidence "does not provide a basis for changing the ALJ's decision." (R. 1-2).

The Appeals Council will consider additional evidence only when it is (1) new, i.e., not "duplicative or cumulative;" (2) material; and (3) relevant to the period on or before the date of the [ALJ's] hearing decision. Meyer v. Astrue, 662 F.3d 700, 705 (4th Cir. 2011) (citing Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991) (en banc). There is no requirement that a claimant show good cause when seeking to present new evidence before the Appeals Council. Wilkins, 953 F.2d at 96 n. 3. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins, 953 F.2d at 96 (citing Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985)). When denying requests for review, the Appeals Council is not required to provide a detailed analysis of its conclusion on post-hearing

evidence.  Id. at 706.  There are circumstances, however, where judicial review is impossible without an adequate explanation of the decision made by an administrator.  DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983); see Riley v. Apfel, 88 F. Supp. 2d 572, 579-80 (W.D. Va. 2000) ("When this court is left in the dark as to how the Appeals Council treated the new evidence a meaningful review is impossible.").  "Where the Appeals Council considered the new evidence, but denied review," the reviewing court must also consider the record as a whole, including the new evidence.  Bowles v. Barnhart, 392 F. Supp. 2d 738, 742 (W.D. Va. 2005) (citing Wilkins, 953 F.2d at 96.  Here, Wilson's post-hearing evidence is not new.

Dr. Tucker's letter recounts Wilson's medical history.  (R. 528).  First, she states that Wilson has "systemic lupus erythematosus complicated by lupus nephritis/chronic kidney disease stage III [and] chronic anemia due to her renal suffering."  Id.  Dr. Tucker then goes on to assert that Wilson is not capable of performing part-time or full-time work due to chronic fatigue caused by her anemia.  Id.  She also explains that Wilson is on immunosuppressive therapy due to chronic kidney disease making her susceptible to "a myriad of life-threatening infectious diseases."  Id.  Finally, Dr. Tucker asserts that Wilson suffers from glaucoma and that it has "a tremendous impact on her visual capabilities."  Id.

Dr. Tucker's letter fails to satisfy the first requirement of Wilkins. 953 F.2d at 96. Wilson's medical history is not "new" evidence of her impairments, because it is "duplicative and cumulative." Id. The ALJ's decision included a detailed review of Wilson's medical history, much of which was based on Dr. Tucker's records. (R. 11-19). The only condition mentioned in the letter that the ALJ did not specifically address is Wilson's glaucoma.[13] (R. 12-19). Wilson's records from Mid Atlantic Eye Care show that she took Alphagan[14] and Travatan,[15] prescription drugs used to treat glaucoma. (R. 244-52). Dr. Rakowski recorded Wilson as taking Travatan but discontinuing Alphagan in January 2012. (R. 257). Dr. Zarate reported glaucoma on a "Patient Active Problem List" when he diagnosed Wilson with meningitis in August 2012. (R. 398). Dr. Bacani-Longa found no visual limitations in Wilson's medical record. (R. 299-306, 307-14). Dr. Tucker does not mention this condition or any treatment in her medical notes. (R. 424-82). Wilson never mentioned any visual impairment as the basis for

---

[13] Glaucoma is a condition that causes damage to the eye's optic nerve and is usually associated with a buildup of pressure inside the eye. Glaucoma, WebMD, http://www.webmd.com/eye-health/glaucoma-eyes (last visited June 24, 2015).

[14] Alphagan is a prescription medicine used to treat glaucoma. Alphagan Opthalmic, WebMD, http://www.webmd.com/drugs/2/drug-13976/alphagan-opht/details (last visited June 24, 2015).

[15] Travatan is a prescription medicine used to treat glaucoma. Travatan Ophthalmic, WebMD, http://www.webmd.com/drugs/2/drug-20653/travatan-ophthalmic/details (last visited June 24, 2015).

her disability.   Accordingly, although the ALJ did not directly address Wilson's glaucoma, Dr. Tucker's letter submitted to the Appeals Council does not provide sufficient new evidence to require remand for any further explanation of its decision to deny review.   See Meyer, 662 F.2d 704-05 ("[N]othing in the Social Security Act or regulations promulgated pursuant to it requires that the Appeals Council explain its rationale for denying review."); see also (R. 125-36) (Continuing Disability Review Report) (recognizing that although Wilson takes prescription medication for glaucoma, she does not have difficulty seeing).

Finally, Dr. Tucker's post-hearing letter also asserts that she is "in full support of reinstatement of [Wilson's] long-term disability benefits . . . ."  (R. 530).  However, determinations of disability are reserved for the Commissioner alone.   20 C.F.R. § 404.1527(d).   There is no obligation to defer to Dr. Tucker's suggestion that Wilson's disability benefits should be reinstated.

## D.  The Court Cannot Consider Wilson's Post-Appeals Council Evidence and it Does Not Warrant Remand

In addition to Dr. Tucker's letter which was received by the Appeals Council, Wilson directly submitted to the court evidence which she obtained after the Appeals Council denied review of her case.   She submitted this evidence, medical

records from recent visits to Dr. Rakowski, as attachments in her pro se pleadings in this court.

"Reviewing courts are restricted to the administrative record in performing their limited function of determining whether the [ALJ's] decision is supported by substantial evidence." Wilkins, 953 F.2d at 96 (quoting Huckabee v. Richardson, 468 F.2d 1380, 1381 (4th Cir. 1972). Reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman, 829 F.2d 514, 517 (4th Cir. 1987) (emphasis added).

Reviewing courts can only remand to the ALJ for consideration of evidence not presented to the ALJ or the Appeals Council when that evidence is (1) new, (2) material, (3) relevant to the time period under consideration, and (4) there is good cause for failure to submit to the ALJ. Wilkins, 953 F.2d at 96 n. 3; see 42 U.S.C. § 405(g).[16] "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins, 953 F.2d at 96 (citing Borders, 777 F.2d at 956).

---

[16] The Code section provides, in part: "The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. 405(g).

Wilson's evidence concerns a blood transfusion in March 2015 and an operation for placement of an arteriovenous (AV) fistula[17] to prepare her to resume dialysis in February 2015. (P's Opp'n to D's Mot. for Summ. J., ECF No. 18). Included is a letter from Dr. Rakowski dated March 19, 2015. (Ex. 5, ECF No. 18-5). Consistent with his earlier letter to the ALJ, (R. 423), Dr. Rakowski acknowledges that Wilson will have to start dialysis again "soon." (Ex. 5, ECF No. 18-5). Wilson also submitted Dr. Rakowski's notes from her appointment on March 4, 2015, stating the same observation that Wilson "needs to start dialysis but not emergently -- her symptoms are getting worse." (Ex. 6, ECF No. 18-6). Because these submissions were not included in the record before the ALJ or the Appeals Council, the court cannot consider them as evidence.

Wilson's submissions fail the third requirement of Wilkins. 953 F.2d at 96 n. 3. Her March 2015 blood transfusion, placement of an AV fistula, and need to start dialysis again "soon" are not relevant to the time period under consideration. Wilkins, 953 F.2d at 96. This treatment pertains to the time period after the Appeals Council's denial of review. More

---

[17] "[A] connection, made by a vascular surgeon, of an artery or a vein" "used to remove and return blood during hemodialysis." Vascular Access for Hemodialysis, National Institute of Diabetes and Digestive and Kidney Diseases, http://www.niddk.nih.gov/health-information/health-topics/kidney-disease/vascular-access-for-hemodialysis/Pages/index.aspx (last updated July 23, 2014).

importantly, it relates to progression of her symptoms after the date of the ALJ's decision, and thus outside the period of time governed by the decision under review here. Wilkins, 953 F.2d at 96. Because the court cannot consider this new evidence, and Wilson's submissions are not relevant to the time period under consideration, remand to the ALJ is not warranted.[18]

## V.   RECOMMENDATION

Because the ALJ adequately explained the weight assigned to the medical source statements on the record and his conclusion that Wilson was not disabled is supported by substantial evidence, the undersigned recommends that the Court DENY Wilson's Motion for Summary Judgment (ECF No. 17), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 22) and AFFIRM the final decision of the Commissioner.

## VI.   REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.   Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of

---

[18] Wilson can still reapply for disability if her condition continues to worsen. "[P]rior adjudication by an ALJ awarding or denying benefits is highly probative, though not conclusive, in a subsequent application and adjudication for the same claimant." Aldridge v. Astrue, 880 F. Supp. 2d 695, 700 (E.D.N.C. 2012) (citing Albright v. Comm'r of Soc. Sec. Admin., 174 F.3d 473, 477 (4th Cir. 1999); see SSAR 00-1(4), 2000 WL 43774, at *3 (Jan. 12, 2000).

mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.    A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. _Thomas v. Arn_, 474 U.S. 140 (1985); _Carr v. Hutto_, 737 F.2d 433 (4th Cir. 1984); _United States v. Schronce_, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia

July ____, 2015

<u>Clerk's Mailing Certificate</u>

A copy of the foregoing Report and Recommendation was mailed this date to each of the following:

**Erika Antoinnette Wilson**
3060 Parkside Drive, Apt. 1
Chesapeake, VA 23324

**Virginia Lynn Van Valkenburg**
United States Attorney Office
101 W Main St., Suite 8000
Norfolk, VA 23510

Fernando Galindo, Clerk


By _____
        Deputy Clerk

        _____, 2015

41